IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | | |
|---|---|---|
| Debbie Edwards, | ) | Civil Action No. 6:13-1519-RBH-KFM |
| Plaintiff, | ) | |
| | ) | **REPORT OF MAGISTRATE JUDGE** |
| vs. | ) | |
| | ) | |
| Carolyn W. Colvin, Acting | ) | |
| Commissioner of Social Security,[1] | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This case is before the court for a report and recommendation pursuant to Local Civil Rule 73.02(B)(2)(a) DSC, concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[2]

The plaintiff brought this action pursuant to Section 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claim for supplemental security income benefits under Title XVI of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

The plaintiff filed an application for supplemental security income ("SSI") on March 8, 2010, alleging that she became unable to work on April 1, 2001. The application was denied initially and on reconsideration by the Social Security Administration. On February 28, 2011, the plaintiff requested a hearing. The administrative law judge ("ALJ"), before whom the plaintiff and witness Amber Edwards appeared on November 3, 2011,

---

[1] Carolyn W. Colvin became the Acting Commissioner of the Social Security Administration on February 14, 2013. Pursuant to Fed.R.Civ.P. 25(d), Colvin should be substituted for Michael J. Astrue as the defendant in this case.

[2] A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

considered the case *de novo*, and on February 24, 2012, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended. The ALJ's finding became the final decision of the Commissioner of Social Security when the Appeals Council denied the plaintiff's request for review on April 9, 2013. The plaintiff then filed this action for judicial review.

In making the determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

> (1)    The claimant has not engaged in substantial gainful activity since March 8, 2010, the application date (20 C.F.R. § 416.971 *et seq.*).
>
> (2)    The claimant has the following severe impairment: bipolar disorder. (20 C.F.R. § 416.920(c)).
>
> (3)    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. § 416.920(d), 416.925 and 416.926).
>
> (4)    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a full range work at all exertional levels but with the following nonexertional limitations: the claimant is limited to understanding, remembering, and carrying out simple instructions. She is also limited to occasional contact with supervisors and co-workers, and can have no contact with the general public.
>
> (5)    The claimant has no past relevant work (20 C.F.R. § 416.965).
>
> (6)    The claimant was born on January 20, 1965, and was 45 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 C.F.R. § 416.963).
>
> (7)    The claimant has a limited education and is able to communicate in English (20 C.F.R. § 416.964).
>
> (8)    Transferability of job skills is not an issue because the claimant does not have past relevant work (20 C.F.R. § 416.968).

(9)    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. § 416.969 and 416.969(a)).

(10)    The claimant has not been under a disability, as defined in the Social Security Act, since March 8, 2010, the date the application was filed (20 C.F.R. § 416.920(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. § 423(a).  "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions.  An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment.  20 C.F.R. § 416.920. If an individual is found not disabled at any step, further inquiry is unnecessary. *Id.* § 416.920(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62, 1982 WL 31386, at *3. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

4

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that the conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

The plaintiff suffers from mental illness exacerbated by the suicides of her two younger brothers in 1992. Her mother was murdered approximately four years before the hearing (Tr. 37). Notes from the Charleston Dorchester Mental Health Center ("CDMHC") indicate that the plaintiff was diagnosed as having a bipolar disorder and an obsessive compulsive disorder in September 2009 (Tr. 259). The plaintiff reported severe irritability and depression after the death of her mother. Findings on mental status examination were normal (*id.*). Her Global Assessment of Functioning ("GAF") score was 65 (Tr. 258, 259).[3] In early October, it was noted that she was having an especially difficult time because it was the anniversary of her mother's murder (Tr. 262). Later that month, the plaintiff reported she had spent all day sleeping on the anniversary of her mother's death, but had trouble sleeping since then, followed by a period of not wanting to get out of bed (Tr. 264). Her GAF at this point was assessed as being 50[4] (Tr. 265). In November, the plaintiff reported she was doing well on her new antidepressant (Cymbalta) and had been able to get out of

---

[3] A GAF score is a number between 1 and 100 that measures "the clinician's judgment of the individual's overall level of functioning." *See* Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders*, 32-34 (Text Revision 4th ed. 2000) ("*DSM-IV*"). A GAF score between 61 and 70 indicates "[s]ome mild symptoms (e.g. depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." *Id.* In March 2009, the plaintiff's GAF was a 62 (Tr. 428).

[4] A GAF score between 41 and 50 indicates "[s]erious symptoms (e.g.. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *See DSM-IV*, 34.

bed and get things done (Tr. 266).  She was also able to do things with her children and husband, and she was sleeping well at night (*id*.).  Findings on mental status examination were normal and her GAF was assessed as being 55 (Tr. 266-67).[5]

In a note from CDMHC from January 2010, the plaintiff reported her mood had been up and down, but that she had visited her sister on Christmas day and had a good Christmas.  She was staying at home most of the time due to cold weather.  She had some trouble falling asleep initially, but was then able to stay asleep (Tr. 295).  In February, the plaintiff said she had not been feeling well and had recently gone to the emergency room due to a syncopal episode (fainting).  There were still days when she did not want to get out of bed, but she was able talk about good memories of her mother, something she had not been able to do since her mother's death (Tr. 268).  Her GAF was assessed at 55 (Tr. 269).  In March 2010, the plaintiff reported her mood had been up and down and that she had experienced some episodes of having too much energy.  She said she had recently been cleaning the home of a friend and had also gone on a "shopping spree."  A mental status examination showed normal findings, other than only fair insight and judgment (Tr. 270-71).  In April 2010, the plaintiff reported she was doing well and was planting a garden, both for food and to have something to do.  She was in the process of paying for her truck, but would have extra money in a few months when it was paid off.  Her mood was stable and she was having no psychotic symptoms (Tr. 291).

On May 21, 2010, the plaintiff underwent a consultative psychological examination conducted by Francis J. Fishburne, Ph.D.  Dr. Fishburne evaluated the plaintiff for bipolar disorder, anxiety, depression, panic disorder, and obsessive compulsive disorder (Tr. 274-78).  Dr. Fishburne mentioned the plaintiff's brothers' suicides in 1992, however he did not mention her mother's murder.  He reported her continued treatment at CDMHC

---

[5] A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational or school functioning. *See DSM-IV*, 34.

but only had access to one followup psychiatric assessment note dated March 25, 2010.

The plaintiff told Dr. Fishburne that she typically did not do much during the day, other than sometimes talking with her daughter. She took care of her own personal care, but depended on her daughter and her daughter's boyfriend to do virtually all chores. She occasionally watched television. She was depressed all the time and went out of the house only for doctor's appointments. She did not like being in crowds and did not visit anyone and was not visited by anyone. She said she had problems with memory and concentration. She thought her medications caused double vision. Dr. Fishburne stated that the plaintiff "was able to understand and follow simple instructions independently" (Tr. 275). On mental status examination, the plaintiff was fully oriented; she appeared anxious and reported a depressed mood; and she displayed no abnormal motor activity, but was fidgety. Attention and concentration appeared mildly impaired, but memory was within normal limits. Her intelligence was estimated to fall within the borderline range (Tr. 276). Judgment was below expected levels, and her insight seemed poor. The plaintiff reported panic attacks around every other day. Dr. Fishburne assessed her GAF as being 55 and indicated that he thought she would have difficulty maintaining focus and attention on tasks during a normal workday (Tr. 277).

Dr. Fishburne further reported that the plaintiff had no hobbies or special interests, did not attend church, belong to clubs or organizations, had no favorite shows on television, nor did she read for pleasure. He noted that she typically went to bed between 8:00 p.m. and 10:00 p.m. and got up between 10:00 a.m. and 2:00 p.m. She had trouble falling and staying asleep and stated that her mind would just not shut down. Dr. Fishburne noted that the plaintiff said that she was depressed all the time, feels alone as if she is a freak and cannot do anything. She had a wish to die as recently as two weeks prior to the exam and suicidal thoughts the day before the evaluation. He noted a previous suicide attempt but related that she had no plan to harm herself or intent to do so. He reported she

did not like going out in crowds and that she felt as if her oxygen is being taken away (Tr. 275).

In June 2010, Michael Neboschick, Ph.D., a state agency psychologist who reviewed the plaintiff's medical records, concluded that she could understand and remember simple instructions; could sustain attention for simple, structured tasks for periods of two hours; could adapt to changes if they were gradually introduced and infrequent; could make simple work-related decisions; could maintain appropriate appearance and hygiene; could recognize and appropriately respond to hazards; and could accept supervision (Tr. 281). Dr. Neboschick felt the plaintiff would be able to work best in slow paced, low volume settings that did not require direct, ongoing interaction with the public (Tr. 281, 314).

In a note from CDMHC in June 2010, the plaintiff said she was doing well. She was driving a rental car because she had recently wrecked her truck. She was working in her garden. A nephew had recently spent a few days staying with her, and she enjoyed having her nieces and nephews visit. Her mood was stable and she was sleeping well with her medications. Mental status findings were normal, and her GAF was assessed at 65, indicating mild symptoms. Her depression was characterized as moderate, and she was noted as having social phobia (Tr. 288-89). Later that month, the plaintiff reported she was having troubles with her marriage and appeared very upset. She was having fantasies about how her husband would feel if she committed suicide. She did not think a counseling session involving him would be a good idea (Tr. 320).

In November 2010, Camilla Tezza, Ph.D., a state agency psychologist, reviewed the plaintiff's updated records and concluded she should be able to do simple work that involved limited public contact (Tr. 341, 345).

Around October 2011, Elizabeth Leonard, M.D., (at CDMHC) filled out a form stating that the plaintiff's bipolar disorder, obsessive compulsive disorder, and anxiety

disorder caused marked restrictions of her social functioning and her ability to maintain concentration, persistence, and pace, and had caused repeated episodes of decompensation, each of extended duration. Dr. Leonard also indicated that these disorders were either permanent or would last at least twelve continuous months (Tr. 429-34).

### *Appeals Council Evidence*

After the ALJ's decision on February 24, 2012, the plaintiff submitted the following evidence to the Appeals Council; the Appeals Council denied the plaintiff's request for review on April 9, 2013, and incorporated the evidence into the record (Tr. 1-4):

The plaintiff returned to CDMHC on December 15, 2010, at which time she said she felt relatively stable mood-wise, but was having problems with insomnia and a low energy level. She reported her concentration was poor, but said she had no psychotic symptoms. Currently, she was distressed because it was near the third anniversary of her mother's murder. On examination, findings (including memory and concentration) were normal, but insight and judgment were rated as only "fair." At this time, her GAF was rated at 60. She was taking Cymbalta, Diazepam, Haldol, Restioril, Synthroid, Lamictal, and Seroquel (Tr. 472-75).

CDMHC notes from January 12, 2011, show the plaintiff continued to complain of sleeping problems and also reported racing thoughts, feelings of agitation and irritation, and poor concentration. She said her energy was good and denied any psychotic symptoms (Tr. 475).

On February 9, 2011, the plaintiff reported she was sleeping very well, and her condition appeared "much improved." Haldol was discontinued. Appetite, energy, concentration and mood were all good. Findings on mental status examination were normal, and her GAF was rated at 60 (Tr. 478-79).

On March 30, 2011, the plaintiff said she still had some anxiety, but otherwise had no problems; she was not having any medication side effects. Examination findings were normal, and her GAF score was unchanged (Tr. 486-87). In April, the plaintiff said she was "doing as usual 'okay.' " She still had anxiety and was using Valium regularly, and she was cautioned that she needed to reduce Valium usage (*id.*).

On February 13, 2012, the plaintiff was hospitalized for a week for a suicide attempt after taking an overdose of Valium following a fight with her daughter (Tr. 498). According to hospital records, she telephoned friends to say goodbye, took 30 Valium tablets, 40 Seroquel tablets, and 20 Lamictal (Lamotrigine) tablets. Her family notified police, and she was taken to the hospital in an unresponsive condition. She was resuscitated in the emergency room. Upon resuscitation, she was described as significantly confused, consistent with "medication induced delirium." She developed respiratory problems consistent with aspiration and required oxygen. By February 20, 2012, the plaintiff's respiratory problems had resolved sufficiently for discharge, and she was no longer considered a threat to harm herself (Tr. 497-504). Notes from this stay indicate that her husband and daughter reported substance abuse was a constant problem for the plaintiff (Tr. 543). They said that in the past, as recently as six months previously, she had abused alcohol, marijuana, and cocaine, but that she currently preferred to abuse "downers" and prescription medications, as well as Adderall (*id.*). The plaintiff and her husband had recently separated, which may have triggered her suicide attempt (Tr. 544).

***Administrative Hearing Testimony***

At the November 2011 administrative hearing (Tr. 25-59), the plaintiff testified that she had not worked at any point during the preceding 15 years (Tr. 29-30). She said she had a phobia about being around people, is in a consistent state of panic, and could not do things like grocery shopping by herself (Tr. 30-31). She lived with her daughter, who did all the cooking and chores (Tr. 39-41). She said she engaged in no social activities and

10

pursued no leisure activities, other than watching television (Tr. 35, 40).  The plaintiff stated that she cannot be in a crowd of people "because I panic and I can't  breathe. . . . " (Tr. 40). She said she had concentration problems and experienced medication side effects such as dizziness and lightheadedness, with occasional fainting spells.  A few months prior to the ALJ hearing, she fainted and was treated at the hospital for low blood pressure and released (Tr. 33-34).  She said she had abused alcohol in the remote past, but claimed she took only her medications at present (Tr. 37-38).

The plaintiff's daughter, Amber, testified that the plaintiff had always had mental problems, but that these had gotten worse (Tr. 46).  The plaintiff did not like going anywhere (*id.*).  She would occasionally go to the grocery store with Amber, but would often leave at the checkout for fear of not having enough money or being judged for their use of food stamps.  Both big and little things could set off panic attacks such as her husband not wanting to buy her cigarettes or being asked to go to a movie (Tr. 46-47).  The plaintiff only interacted with her family, and Amber did not feel she could deal with others.  She would sometimes break down and cry or get extremely angry when she was around others.  She does not routinely drive a car; however, when she has tried, she has had to pull over to breathe (Tr. 48).  She could not stand for long periods, lift anything, or walk too far, and she had pain in her knees, hand, back, and neck (Tr. 29).  She had one long-time friend, but did not talk with her all that much (Tr. 49).  The plaintiff followed no regular routine.  Amber said she had cut herself off from her sister and other family members (Tr. 50-51).  The plaintiff could also get violent and could make suicide threats (Tr. 51-52, 55).  Her memory was not good, and she needed reminders of appointments (Tr. 53-54).

*Vocational Evidence*

A state agency analyst who reviewed the medical assessments in the record identified three occupations the plaintiff should be able to do, given her limitations: silver wrapper, hotel and restaurant (D.O.T No. 318.687-018), bander, pen and pencil (D.O.T No. 733.687-018), and plugger (D.O.T No. 764.687-098) (Tr. 181-82).  All these jobs involve simple, unskilled work in which interaction with others is not a significant part of the job duties.

## ANALYSIS

The plaintiff was born on January 20, 1965, and she was 47 years old on the date the ALJ issued his decision.  She attended school through the tenth grade and worked as a part-time clerk in a video store for several years in the 1980s.  She has not worked during the past 15 years (Tr. 28, 29, 42, 144, 153).  The ALJ found that the plaintiff's mental impairments did not meet or equal any listed impairment (Tr. 14-15), but did limit her to tasks involving only simple instructions, which did not require more than occasional contact with supervisors and co-workers and did not require any contact with the general public (Tr. 15-18).  The ALJ concluded that the plaintiff could perform other jobs existing in the national economy based on rule 204.00 of the Medical-Vocational Guidelines (Tr. 18-19).

The plaintiff argues that the ALJ erred by (1)  failing to properly address the weight or credibility of her testimony and the testimony of her daughter, and (2)  failing to assign appropriate weight to the opinions of Drs. Fishburne and Leonard.  The plaintiff further argues that evidence submitted to the Appeals Council demonstrates that the ALJ erred in failing to give controlling weight to the opinion of Dr. Leonard.

*Credibility*

The plaintiff first argues that the ALJ erred in failing to provide sufficient analysis of and give sufficient weight to her testimony and that of her daughter (pl. brief 2-6).

12

The Fourth Circuit Court of Appeals has stated as follows with regard to the analysis of a

claimant's subjective complaints:

> [T]he determination of whether a person is disabled by pain or
> other symptoms is a two-step process.  First, there must be
> objective medical evidence showing the existence of a medical
> impairment(s) which results from anatomical, physiological, or
> psychological abnormalities and which could reasonably be
> expected to produce the pain or other symptoms alleged. . . .
> It is only after a claimant has met her threshold obligation of
> showing by objective medical evidence a medical impairment
> reasonably likely to cause the pain claimed, that the intensity
> and persistence of the claimant's pain, and the extent to which
> it affects her ability to work, must be evaluated.

*Craig v. Chater*, 76 F.3d 585, 593, 595 (4th Cir. 1996).  In *Hines v. Barnhart*, 453 F.3d 559

(4th Cir. 2006), a Fourth Circuit Court of Appeals panel held, "Having met his threshold

obligation of showing by objective medical evidence a condition reasonably likely to cause

the pain claimed, [the claimant] was entitled to rely exclusively on subjective evidence to

prove the second part of the test, i.e., that his pain [was] so continuous and/or severe that

it prevent[ed] him from working a full eight-hour day." 453 F.3d at 565.  However, the court

in *Hines* also acknowledged that "'[o]bjective medical evidence of pain, its intensity or

degree (i.e., manifestations of the functional effects of pain such as deteriorating nerve or

muscle tissue, muscle spasm, or sensory or motor disruption), if available should be

obtained and considered.'" *Id.* at 564 (quoting SSR 90-1p, 1990 WL 300812).

> The court further acknowledged:
>
> While objective evidence is not mandatory at the second step
> of the test, "[t]his is not to say, however, that objective medical
> evidence and other objective evidence are not crucial to
> evaluating the intensity and persistence of a claimant's pain and
> the extent to which it impairs her ability to work. They most
> certainly are. Although a claimant's allegations about her pain
> may not be discredited solely because they are not
> substantiated by objective evidence of the pain itself or its
> severity, they need not be accepted to the extent they are
> inconsistent with the available evidence, including objective
> evidence of the underlying impairment, and the extent to which

that impairment can reasonably be expected to cause the pain
the claimant alleges she suffers."

*Id*. at 565 n.3 (quoting *Craig*, 76 F.3d at 595). *See Johnson v. Barnhart*, 434 F.3d 650, 658 (4th Cir. 2005); 20 C.F.R. § 416.929(c)(2) ("We must always attempt to obtain objective medical evidence and, when it is obtained, we will consider it in reaching a conclusion as to whether you are disabled.  However, we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements."); SSR 96-7p, 1996 WL 374186, at *6 ("[T]he absence of objective medical evidence supporting an individual's statements about the intensity and persistence of pain or other symptoms is only one factor that the adjudicator must consider in assessing an individual's credibility and must be considered in the context of all the evidence.").

A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical evidence and other evidence. 20 C.F.R. § 416.929(c)(4).  Furthermore, "a formalistic factor-by-factor recitation of the evidence" is unnecessary as long as the ALJ "sets forth the specific evidence [he] relies on in evaluating the claimant's credibility." *White v. Massanari*, 271 F.3d 1256, 1261 (10th Cir. 2001).  Social Security Ruling 96-7p states that the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record." 1996 WL 374186, at *4.  Furthermore, it "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight." *Id.*

The factors to be considered by an ALJ when assessing the credibility of an individual's statements include the following:

(1)    the individual's daily activities;

(2)    the location, duration, frequency, and intensity of the
        individual's pain or other symptoms;

14

(3)     factors that precipitate and aggravate the symptoms;

(4)     the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

(5)     treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

(6)     any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

(7)     any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Id.* at *3.  *See* 20 C.F.R. § 416.929(c).

The ALJ found that while the plaintiff's impairments could reasonably be expected to cause some of her alleged symptoms, her statements concerning the intensity, persistence and limiting effects of her symptoms were not fully credible (Tr. 16). Specifically, the ALJ cited two function reports: one from April 2010 when the plaintiff reported that she drove her daughter to the store once a week and was able to attend all of her doctors' appointments and one from August 2010 when the plaintiff reported that she went to the store only when absolutely necessary and that she watched television with her family (Tr. 16).  The ALJ also noted that it appeared that the plaintiff had not received ongoing mental health treatment after June 2010, a month in which she reported she was doing well (Tr. 16, 18; *see* Tr. 288-89).  As will be discussed below, the plaintiff ultimately did submit to the Appeals Council updated records regarding her treatment after June 2010 (Tr. 446-90).  The ALJ also cited GAF scores of between 55 and 65, indicating only mild to moderate symptoms, and examinations showing no memory deficits and only mildly impaired attention and concentration (Tr. 16-18).  With regard to the plaintiff's daughter's testimony as to the plaintiff's "frequent panic attacks," that she "does not interact well with others, her "frequent mood changes," and complaints of "suicidal thoughts," the ALJ gave

15

the testimony "little weight as it is inconsistent with the claimant's treatment notes and the remaining medical evidence of record" (Tr. 16).

As acknowledged by the Commissioner, the ALJ did not set out the specific discrepancies and contradictions between the plaintiff's testimony (and that of her daughter) and other evidence in the record (def. brief 14). The Commissioner argues that the ALJ was only required to " 'minimally articulate' his reasoning so as to 'make a bridge' between the evidence and his conclusions" (*id.* 16 (quoting *Fischer v. Barnhart*, 129 F. App'x 297, 303 (7th Cir. 2005)). While the Commissioner accurately states the law, there is no bridge between the evidence and the ALJ's conclusions in this case. The ALJ set forth summaries of the medical records, the plaintiff's testimony, and her daughter's testimony, which the Commissioner seeks to rely on in support of the ALJ's credibility determination. However, the reasons offered by the ALJ in support of the determination are conclusory and, while support for them may well exist, the ALJ has failed to state them specifically enough "to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *See* SSR 96–7p, 1996 WL 374186, at *4. Accordingly, the undersigned recommends that the matter be remanded for further consideration of the testimony of the plaintiff and her daughter. The ALJ should be directed to assess their credibility in accordance with 20 C.F.R. § 416.929 and SSR 96–7p, 1996 WL 374186, at *3-4.

### *Opinion Evidence and Appeals Council Evidence*

The plaintiff further argues that the ALJ failed to properly consider the opinions of treating physician Dr. Leonard and examining physician Dr. Fishburne (pl. brief 6-13). The regulations require that all medical opinions in a case be considered, 20 C.F.R. §§ 404.1527(b), 416.927(b), and, unless a treating source's opinion is given controlling weight, weighed according to the following non-exclusive list:  (1)  the examining relationship; (2) the length of the treatment relationship and the frequency of the examinations; (3)  the nature and extent of the treatment relationship; (4)  the evidence with which the physician

16

supports his opinion; (5) the consistency of the opinion; and (6) whether the physician is a specialist in the area in which he is rendering an opinion. *Id.* §§ 404.1527(c)(1)-(5), 416.927(c)(1)-(5). *See also Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005). However, statements that a patient is "disabled," "unable to work," meets the listing requirements, or similar assertions are not medical opinions. These are administrative findings reserved for the Commissioner's determination. SSR 96-5p, 1996 WL 374183, at *5.

The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case. *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). Social Security Ruling ("SSR") 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion. 1996 WL 374188, at *5. As stated in SSR 96-2p:

> [A] finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in [20 C.F.R. § 416.927]. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

*Id.* at *4.

Dr. Leonard opined in October 2011 that the plaintiff's bipolar disorder, obsessive compulsive disorder, and anxiety disorder caused marked restrictions of her social functioning and her ability to maintain concentration, persistence, and pace, and had caused repeated episodes of decompensation, each of extended duration. Dr. Leonard also indicated that these disorders were either permanent or would last at least twelve

17

continuous months.  She further opined that the plaintiff met the listings for anxiety disorder, obsessive compulsive disorder, and bipolar II disorder (Tr. 429-34).  The ALJ gave the opinion "little weight as it is not explained and not well supported by the claimant's treatment notes and remaining medical evidence of record" (Tr. 18).

One of the specific reasons the ALJ gave for giving Dr. Leonard's October 2011 opinion little weight was that "nothing indicates that Dr. Leonard has seen the [plaintiff] since June 2010, a month in which the [plaintiff] reported that she was doing well, with stable mood, and had a global assessment of functioning score of 55-65" (Tr. 18).  As set forth above, the plaintiff submitted records to the Appeals Council showing that Dr. Leonard treated her on December 15, 2010; January 12, 2011; February 9, 2011, and March 30, 2011 (pl. brief 12; *see* Tr. 472-79. 486-87).  The plaintiff also submitted evidence from February 2012 (three months after the hearing but two weeks prior to the ALJ's decision) showing she was hospitalized for a week for a suicide attempt after taking an overdose (Tr. 497-504).

Dr. Fishburne examined the plaintiff in May 2010 and indicated that he thought she would have difficulty maintaining focus and attention on tasks during a normal workday (Tr. 277).  The ALJ acknowledged this opinion but noted that Dr. Fishburne also found that the plaintiff could understand and follow simple instructions, which the ALJ stated was consistent with the plaintiff's residual functional capacity as he found it (Tr. 17).

As the undersigned recommends that the ALJ's decision be remanded for further consideration of the credibility of the plaintiff and her daughter, the undersigned further recommends that the ALJ be instructed to reconsider the opinions of Drs. Leonard and Fishburne in light of all of the evidence of record, including the treatment notes that were submitted to the Appeals Council and are now part of the record.

## CONCLUSION AND RECOMMENDATION

Now, therefore, based on the foregoing, this court recommends that the Commissioner's decision be reversed pursuant to sentence four of 42 U.S.C. § 405(g) and that the case be remanded to the Commissioner for further consideration as discussed above.

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald
United States Magistrate Judge

June 23, 2014
Greenville, South Carolina